## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEVRO CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-291-CFC |
| | ) | |
| NALU MEDICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT NALU MEDICAL, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS UNDER RULE 12(b)(6)

OF COUNSEL:

A. James Isbester
Megan M. Chung
KILPATRICK TOWNSEND &
STOCKTON LLP
12255 El Camino Real, Suite 250
San Diego, CA 92130

Maureen P. Long
KILPATRICK TOWNSEND &
STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400

Dated: July 6, 2020

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION & SUMMARY OF THE ARGUMENT ..........................- 1 -

II.  STATEMENT OF FACTS ............................................................... - 4 -

III. ARGUMENT ............................................................................ - 8 -

    A.  Nevro Fails to Allege that the Nalu Neurostimulation System Has Ever
        Been Used in an Infringing Manner........................................................- 8 -

        1.  Complaints for Patent Infringement Must State a Plausible Basis
           for Concluding that the Accused Product Satisfies All Requirements
           of the Asserted Patent Claim ............................................................- 8 -

        2.  The FAC Fails to Allege that the Nalu System Operates in a Patient
           or Has Been Programmed to Generate Therapy at the Claimed
           Parameters ............................................................................- 10 -

    B.  Nevro's Allegations are Insufficient to Meet the Knowledge Requirements
        of Induced or Willful Infringement........................................................- 15 -

IV. CONCLUSION ......................................................................... - 17 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir.), *opinion amended on reh'g*, 131 F.3d
1009 (Fed. Cir. 1997) .................................................................................14

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*,
501 F.3d 1307 (Fed. Cir. 2007) ......................................................10, 11, 13, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................1, 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................1, 8

*Boston Scientific Corp. v. Nevro Corp.*,
415 F. Supp. 3d 482 (D. Del. 2019) (J. Connolly) ...................................9, 15, 16

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ....................................................................9

*Dodots Licensing Solutions LLC v. Lenovo Holding Co.*,
No. 18-098, 2018 WL 6629709 (D. Del. Dec. 19, 2018) ....................................12

*Dynamic Data Techs. v. Google LLC*,
No. CV 19-1529-CFC, 2020 WL 1285852 (D. Del. Mar. 18, 2020),
*report and recommendation adopted sub nom. Dynamic Data
Techs., LLC v. Google LLC*, No. CV 19-1529-CFC, 2020 WL
3103786 (D. Del. June 11, 2020) ..............................................................15, 16

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ......................................................10, 11, 13, 15

*Judin v. United States*,
110 F.3d 780 (Fed. Cir. 1997) ....................................................................15

*Modern Telecom Sys., LLC v. TCL Corp.*,
No. 17-583-LPS-CJB, 2017 WL 6524526 (D. Del. Dec. 21, 2017) ................8, 9

*Nevro Corp. v. Boston Sci. Corp.*,
    No. 3:16-cv-06830-VC (N.D. Cal. July 11, 2018) ................................................3

*Raindance Techs., Inc. v. 10x Genomics, Inc.*,
    No. 15-152-RGA, 2016 WL 927143 (D. Del. Mar. 4, 2016)...........................8, 9

*SIPCO, LLC v. Streetline, Inc.*,
    No. 16-830-RA, 2017 WL 10795601 (D. Del. June 21, 2017) ...........................9

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
    208 F.3d 981 (Fed. Cir. 2000) .........................................................................15

**Statutes & Rules**

35 U.S.C. § 271(e)(1)............................................................................................14

Fed. R. Civ P. 12(b)(6)............................................................................................1

## I.    INTRODUCTION & SUMMARY OF THE ARGUMENT

Defendant Nalu Medical, Inc. ("Nalu") moves to dismiss Plaintiff Nevro Corp.'s ("Nevro") First Amended Complaint (D.I. 14, "FAC") for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The heightened pleading standards of *Twombly*[1] and *Iqbal*[2] require more than conclusory statements and threadbare recitals of the elements of a cause of action.  A plaintiff must allege facts that plausibly indicate that the accused products contain each of the limitations found in the claim.  In addition, a plaintiff asserting induced infringement or willful infringement must allege facts that plausibly demonstrate that the infringer had knowledge of the patent, and knowledge of its direct or indirect infringement of the patent.  Nevro fails to allege facts that plausibly indicate Nalu's Neurostimulation System contains each limitation of the asserted claims, and also fails to allege facts that plausibly indicate that Nalu had knowledge of direct or indirect infringement of the asserted claims.

Nevro accuses Nalu of directly and indirectly infringing claim 1 of U.S. Patent Nos. 10,471,258 ("'258 patent"), 9,333,358 ("'358 patent"), 8,712,533 ("'533 patent"), 8,359,102 ("'102 patent"), 9,333,357 ("'357 patent"), and claim 18

---

[1] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).
[2] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

of U.S. Patent No. 9,327,125 ("'125 patent") (collectively, "the Asserted Patents").

Each of these claims is directed to a spinal cord modulation system that contains an

implantable device that delivers a non-paresthesia-producing therapy signal to the

patient's spinal cord region.  With the exception of claim 1 of the '357 patent, each

of the claims Nevro references requires that the claimed system be programmed  to

provide a therapy signal (or in some instances, at least a portion of the therapy

signal) within a specific frequency range at or above 1.5 kilohertz (kHz).  Claim 1

of the '357 patent is similar except that instead of specifying a signal frequency, it

requires that the therapy signal include "a plurality of *sequential bi-phasic pulses*

having a pulse width between 10 microseconds and 333 microseconds....[Emphasis

added.]"

Nevro's FAC fails to state direct, induced, or willful infringement claims for

several reasons.  First, Nevro fails to provide a plausible basis on which to

conclude that any Nalu system has ever been programmed to operate at the

frequencies or to generate the sequence of pulses required by the claims.  The

clinician (i.e., the doctor), responding to patient preferences during surgery or after

surgery, determines the parameters of the therapy signal which only then are

programmed into the system.  D.I. 14 ¶33; D.I. 14-1 at 241-263.  Thus, the accused

device can only potentially meet these claim limitations if the clinician in the field

causes the device to be programmed so that the claim limitations are met.  Yet the

FAC is silent on the parameters that have been programmed into a single Nalu

system implanted in a human being in this country.  Nevro nowhere alleges even

that Nalu specifically intends for clinicians to program the device to operate at the

claimed parameters.

Second, Nevro's FAC contradicts its own conclusion that there is any

infringement (direct or indirect).  As Nevro has accurately alleged, the FDA only

cleared the Nalu product for frequencies as high as 1.5 kHz and as low as 2 Hz.[3]

Programming the Nalu system to operate at frequencies outside this range would

be an unapproved "off-label" use.  Nowhere does Nevro offer reason to believe

that Nalu is encouraging clinicians in the field to use the Nalu device in ways that

are not cleared by the FDA.  Nevro, in fact, does not offer evidence of unapproved,

"off-label" use of the Nalu device at all.  In other words, the FDA has only cleared

the Nalu system for use at frequencies that do not meet the requirements of the

---

[3] Nalu received clearance for these frequencies because they were substantially equivalent to existing spinal cord modulation treatments. D.I. 14-1 at 254.  In fact, Nevro acknowledges on the face of its patents that spinal cord modulation treatments below 1,500 Hz were well known in the prior art.  *See, e.g.*, D.I. 14-1 at 83 ('358 patent at col. 6 ll. 43-51) noting standard SCS treatments "included stimulation at a frequency of less than 1500 Hz"; D.I. 14-1 at 190 ('125 patent at col. 6 ll. 45-51) (same).  Furthermore, in its litigation against Boston Scientific involving some of the Asserted Patents, Nevro conceded that in that case it has no rights below 1,200 Hz, agreeing that Boston Scientific's accused product would not infringe if the therapy signal were under 1.2 kHz.  Markman Hr'g Tr. at 69:7-12, 18:25-19:3, *Nevro Corp. v. Boston Sci. Corp.*, No. 3:16-cv-06830-VC (N.D. Cal. July 11, 2018), ECF No. 427.

asserted patents; Nevro has failed to allege that any Nalu device has been programmed to provide a therapy signal with a frequency outside the FDA clearance range; and therefore Nevro has failed to allege any basis for infringement.

Finally, to the extent Nevro seeks redress for alleged indirect infringement and willful infringement, Nevro bears the burden of demonstrating that not only did Nalu know, or was willfully blind to Nevro's patents, but that Nalu knew that its own activities would result in infringement of those patents.  Nevro's FAC fails to allege any plausible facts to show that Nalu had knowledge of any alleged infringement, or that it was willfully blind to any alleged infringement.  At most, Nevro's allegations show that Nalu was aware of Nevro's patents, and was aware that Nevro had filed patent infringement lawsuits against unrelated companies, asserting that other companies' unrelated products infringe at least some of the Asserted Patents.  This is plainly insufficient to establish that Nalu knew too that its own product infringed.

## II.    STATEMENT OF FACTS

Nalu is a small start-up medical device company.  Nalu received FDA clearance in March 22, 2019 for its Neurostimulation System.  D.I. 14-1 at 241 (FAC. Ex. 7).  Nalu has plans for a full commercial launch of its Nalu Neurostimulation System in 2020.  D.I. 14 ¶7.

On February 28, 2020, Nevro filed its original complaint, asserting infringement of claim 1 of the '258 patent and claim 1 of the '358 patent. D.I. 1 ¶¶41-42, 49-50. On May 4, 2020, Nalu moved to dismiss the Complaint. D.I. 9.

Nevro did not oppose Nalu's motion to dismiss. Instead, on June 1, 2020, Nevro filed the FAC. Most notably, the FAC adds causes of action for the infringement of four more Nevro patents, specifically, claim 1 of the '533 patent, claim 1 of the '102 patent, claim 18 of the '125 patent, and claim 1 of the '357 patent.

The factual allegations of the FAC, while adding extensive text, do not address the deficiencies Nalu identified in its motion to dismiss. Nevro alleges that the Nalu Neurostimulation System includes an implantable pulse generator ("IPG") that "acts to help control therapy delivery." D.I. 14 ¶¶24, 26. The Nalu IPG is powered by an externally-worn, battery powered device, i.e., Nalu's "Therapy Disc," which powers the IPG using RF wireless transmission. *Id.* ¶¶30-31. "The Nalu Neurostimulation System is *configured* using a Clinical Programmer Application *during surgery and programming.* During this process, '[t]he programmer is responsible for *configuring the devices to deliver therapy according to clinician defined levels* and patient preferences[.]'" *Id.* ¶33 (quoting D.I. 14-1 at 247) (emphasis added); *see also* D.I. 14-1 at 260 (stating the Clinical Programmer "[a]llows [the] *healthcare provider* to set desired therapy levels and device

settings") (emphasis added).  Thus, Nevro alleges that the accused system, through a unit called the Clinical Programmer, is programmed during surgery to delivery therapy according to levels chosen at that time by the doctor—not when Nalu manufactures or sells or ships the device.

With respect to the actual therapy signals the Nalu device produces in patients, Nevro alleges and refers to abstracts and information from studies, many of which apparently were done outside the United States.  D.I. 14-1 at 279 n. 1-10 (listing centers in Australia and United Kingdom).  None of those studies actually state what therapy signal with what frequency was used in operation.  D.I. 14-1 at 276-83.  Nevro, for example, refers to an abstract describing "patterned high frequency" stimulation, and offers the self-serving, unsupported assertion that "[s]ince the entry of Nevro into the market, 'high frequency' is understood in this context to include frequencies of 1,500 Hz and above."  D.I. 14 ¶43 (citing D.I. 14-1 at 281).[4]  Further, while Nevro does identify a single study that describes an actual therapy signal, Nevro concedes that the therapy signal was only applied to lab rats.  D.I. 14 ¶44; D.I. 14-1 at 285.

---

[4] One wonders how to describe a treatment in which the patient experiences 1,200 pulses per second.  "High frequency" would seem apt, particularly in light of historical treatments using frequencies as low as just a few pulses per second. *See, e.g.*, D.I. 14-1 at 83 ('358 patent at col. 6 ll. 43-51) (noting existing treatments used frequencies of "60-80 Hz"); D.I. 14-1 at 254 (listing treatments with frequencies as low as 2, 5, or 10 pulses per second).  Yet such a therapy would be well outside the ranges covered by Nevro's patents.

A key factual foundation to the FAC is an instruction for use manual ("IFU") that Nevro contends applies to a portion of the Nalu device. Nevro notes that the IFU states that the available stimulation parameters include a frequency of "1Hz-10kHz." D.I. 14-1 at 274. On this evidence, Nevro alleges that the Nalu system can generate or deliver therapy at frequencies up to and including 10,000 Hz. D.I. 14 ¶¶7, 43, 51.

With respect to indirect and willful infringement, Nevro alleges that Nalu is aware of the Asserted Patents through Nevro's patent markings, and Nevro's lawsuits against other companies asserting a subset of these patents against unrelated accused products. D.I. 14 ¶47. Nevro also alleges that Nalu was aware of the Asserted Patents due to Nalu's citation of them in patent applications.

Nalu's counsel informed Nevro's counsel of the deficiencies in the Nevro's original Complaint by letter dated April 20, 2020. D.I. 11 ¶2. Specifically, Nalu pointed out that the original Complaint lacked any allegation that the Nalu Neurostimulation System has ever operated in a patient or been programmed to generate a patient therapy at the frequencies required by the asserted claims. *Id.* Counsel for the parties discussed this issue by telephone and exchanged further correspondence. *Id.* ¶3. On April 29, 2020, Nalu's counsel offered that Nalu would not oppose if Nevro wanted to amend its complaint to cite or provide additional information. *Id.* ¶4. Nevro did not avail itself of this offer, which led to

- 7 -

Nalu filing a motion to dismiss the original complaint on May 4, 2020. Rather than oppose that motion to dismiss, Nevro filed the FAC.

Nevro's FAC still fails to allege plausible grounds to conclude that the Nalu Neurostimulation System has ever been programmed to operate in a patient in a manner that falls with the requirements of the Nevro claims. Nalu therefore now renews its motion to dismiss. Moreover, as it is clear that Nevro cannot cure its pleading deficiencies, Nalu respectfully requests that the motion be granted without leave to amend, i.e., with prejudice.[5]

## III.   ARGUMENT

### A.   Nevro Fails to Allege that the Nalu Neurostimulation System Has Ever Been Used in an Infringing Manner

#### 1.   Complaints for Patent Infringement Must State a Plausible Basis for Concluding that the Accused Product Satisfies All Requirements of the Asserted Patent Claim

It is well settled that claims of direct and indirect patent infringement are subject to the pleading requirements of *Twombly* and *Iqbal*. *See Modern Telecom Sys., LLC v. TCL Corp.*, No. 17-583-LPS-CJB, 2017 WL 6524526, at *2 (D. Del. Dec. 21, 2017); *see also Raindance Techs., Inc. v. 10x Genomics, Inc.*, No. 15-152-RGA, 2016 WL 927143, at *2 (D. Del. Mar. 4, 2016). "To plead direct

---

[5] Further amendment cannot cure the pleading deficiencies. The programming device the clinician uses to define the therapy signal does not allow the clinician to create a therapy signal that falls outside the FDA clearance. As a result, the clinician simply cannot program the Nalu system to operate in a manner that falls within the scope of the claims.

infringement, a plaintiff must allege facts that plausibly indicate that the accused products contain each of the limitations found in the claim." *See Boston Scientific Corp. v. Nevro Corp.*, 415 F. Supp. 3d 482, 489 (D. Del. 2019) (J. Connolly) (internal quotation marks omitted); *see also Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002); *Modern Telecom*, 2017 WL 6524526, at *3; *Raindance*, 2016 WL 927143, at *2-3 (dismissing plaintiff's patent complaint where the claims recited limitations related to "pressure" that the complaint did not address). After all, "[f]actual allegations that do not permit a court to infer that the accused product infringes each element of at least one claim are not suggestive of infringement." *Modern Telecom*, 2017 WL 6524526, at *2, n.5.

As this Court has also noted, "[t]he complaint must place the potential infringer on notice of what activity is being accused of infringement. To provide notice, a plaintiff must generally do more than assert that the product infringes the claim; it must show *how* the defendant plausibly infringes by alleging some facts connecting the allegedly infringing product to the claim elements." *Boston Scientific*, 415 F. Supp. 3d at 489 (internal quotation marks and citation omitted; italics in original); *see SIPCO, LLC v. Streetline, Inc.*, No. 16-830-RA, 2017 WL 10795601, at *2 (D. Del. June 21, 2017) ("There are numerous district court decisions that require, to plausibly state a claim for patent infringement, that the

- 9 -

complaint relate its factual allegations to an asserted claim of the patent"). Where the claims of a patent require the claimed invention to perform in a certain way, direct infringement only arises from that performance. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("[I]t is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement."); *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the ... patent."). Merely creating something that has the ability to perform as required by the claims is not, in itself, direct infringement

### 2. The FAC Fails to Allege that the Nalu System Operates in a Patient or Has Been Programmed to Generate Therapy at the Claimed Parameters

All claims of the Asserted Patents require a therapy signal with specific parameters when operated with a patient. All of the Asserted Patents other than the '357 patent require some or all of the therapy signal to have a frequency of 1.5 kHz or greater. Claim 1 of the '258 patent, for example, requires a pulse generator "that, in operation, generates" a therapy signal, a portion of which has a frequency "between 1.5 kHz and 15 kHz." *See also* '358 patent claim 1 ("between 1.5 KHz and 50 kHz"); '533 patent claim 1 ("from 1.5 kHz to 100 kHz"); '102 patent claim 1 ("from about 1.5 kHz to about 50 kHz"); '125 patent claim 18 ("from 1.5 kHz to

100 kHz"). Claim 1 of the '357 patent specifies other parameters of the therapy signal, requiring that the signal have "a plurality of sequential bi-phasic pulses having a pulse width between 10 microseconds and 333 microseconds, and an amplitude between 0.5 mA and 10 mA."

Nevro alleges that "Nalu has received FDA clearance to promote the Nalu Neurostimulation System in the United States using pulse frequencies of 2 Hz to 1,500 Hz, pulse widths of 12 to 1000 µsec, and amplitudes of 0 to 10.2 mA." D.I. 14 ¶37. Nevro also alleges that the IFU shows "that the available stimulation parameters for the Nalu Neurostimulation System include frequencies of 1 Hz to 10,000 Hz, pulse widths of 10 µsec to 2 ms, and amplitudes of 0 µA to 10.2 mA." D.I. 14 ¶34. But there is no plausible allegation in the Complaint that the Nalu Neurostimulation System has ever operated in a patient or been programmed to generate a patient therapy at the parameters required by the Asserted Patents.

Nevro rests heavily on the IFU. As the FAC admits in Paragraph 34 and Exhibit 8 to the FAC, however, the IFU does *not* say that a Nalu system actually operates in patients to generate signal frequencies, pulse widths, or amplitudes that meet the claim requirements. All Nevro can conclude from the IFU is that the system it describes *could* generate such a signal. Whether the Nalu system *has the capability* to generate a high frequency signal is not enough. *See Fujitsu*, 620 F.3d at 1329); *ACCO Brands,* 501 F.3d at 1313. The claims require *the system be*

*programmed or configured to* generate therapy signals with frequencies at or above than 1,500 Hz.  On the programming of the system, the 2017 IFU is silent.

Moreover, it is plain on the face of the FAC that this document is irrelevant. The source of the 2017 IFU is not Nalu but rather, a website called "usermanual.wiki" (D.I. 14, fn 3).[6]  The purported date of the IFU (June 8, 2017 (D.I. 14-1 at 266)) is more than two years before the FDA clearance.  Furthermore, the 2017 IFU describes a device that is thinner (8 mm versus 1.5 cm) and lighter (75 gms versus 80 gms) than the device that is the subject of Nalu's FDA clearance.  Compare D.I. 14-1 at 259 to D.I. 14-1 at 274.

"[A] court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Dodots Licensing Solutions LLC v. Lenovo Holding Co.*, No. 18-098, 2018 WL 6629709, at *1 (D. Del. Dec. 19, 2018) (quoting *Secured Mail Sols. LLC v. Universal Wilde, Inc*., 873 F.3d 905, 913 (Fed. Cir. 2017)).  The evidence Nevro has provided as attachments to its FAC demonstrate that Nevro's reliance upon the IFU is misplaced.  The Court need not accept Nevro's allegations regarding the IFU; indeed, had Nevro examined its own record more carefully, it would have realized that it should never have presented the IFU as relevant.

---

[6]  Nevro seems to believe that a website repository for user manuals is a good source for instructions on performing neurosurgery.

- 12 -

Finally, although the FDA clearance allows Nalu's system to be programmed to operate at frequencies between 2 Hz and 1,500 Hz, pulse widths of 12 to 1000 µsec, and amplitudes of 0 to 10.2 mA, this again shows at most that the Nalu system *could* generate a signal within those parameters. *Fujitsu*, 620 F.3d at 1329); *ACCO Brands,* 501 F.3d at 1313. There is no plausible evidence that anyone has ever provided therapy with the approved Nalu system in the frequencies or with the specific bi-phasic pulses cited in the claims. Although Nevro makes the conclusory allegation that "at least one patient has received such therapy" with respect to each Asserted Patent (D.I. 14 ¶¶ 55, 66, 76, 87, 96, 107), Nevro fails to support this assertion with any factual allegations. Who was this patient? In what country does the patient reside?[7] Who did the programming? Did the patient experience paresthesia?[8] In other words, what is the basis for Nevro's conclusory statement? In fact, in the entirety of Nevro's factual allegations, the only subjects Nevro identifies that actually received a therapy signal at a frequency in the claimed ranges (a "10 kHz tonic" signal) were lab rats,

---

[7] As noted above, many of the studies that Nevro cites were done outside the United States. D.I. 14-1 at 279 n. 1-10 (listing centers in Australia and United Kingdom).
[8] The keystone to Nevro's patent estate is the delivery of a signal that is therapeutic, but that does not produce "paresthesia" in the patient. All of the claims require this, yet the FAC is silent as to whether the purported patient experienced paresthesia.

not human patients.  D.I. 14 ¶44; D.I. 14-1 at 285.[9]  The rats, of course, were

unable to express whether or not they experienced paresthesia.

Furthermore, Nevro's attempt to excuse its failure to investigate by

contending that "the precise software parameters and therapy parameters used on

patients are non-public and are uniquely within Nalu's control" (D.I. 14 ¶¶55, 66,

76, 87, 96, 107) is unavailing.  This is not a situation in which Nalu is accused of

infringing Nevro's patents by doing something that is otherwise within Nalu's

FDA cleared therapy parameters.  Rather, Nevro is accusing Nalu of causing its

product to be used in a manner that the FDA has not cleared.  Yet what is the

evidence Nevro offers for such a serious accusation?  That Nalu has described

things in its own patents outside the scope of Nalu's FDA clearance; that Nalu

possibly has a device that *could* be programmed to operate in a manner outside of

Nalu's FDA clearance; that Nalu affiliates have conducted experiments on rats

that, if done on humans, would fall outside Nalu's FDA clearance.  Surely, before

filing the complaint, Nevro was required to "at a bare minimum, apply the claims

---

[9] Nevro's contention that the studies it cites are "not subject to a regulatory safe
harbor for patent infringement" simply because "they were not used in Nalu's
application for FDA approval" (D.I. 14 ¶41) is inaccurate.  Even if the studies
disclosed infringing data, which they do not, they would be subject to the 35 U.S.C.
§ 271(e)(1) safe harbor "[a]s long as the activity is reasonably related to obtaining
FDA approval."  *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1030 (Fed. Cir.),
*opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997).

of each and every patent that is being brought into the lawsuit to an accused device." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000); *see also Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (sanctions for not obtaining a sample device, dissect or reverse-engineer it and compare sample device to the claims prior to filing the complaint).

Accordingly, Nevro's failure to plead allegations supporting direct infringement of the claimed therapy signal parameters warrants dismissal of its direct infringement claims. *Fujitsu*, 620 F.3d at 1329); *ACCO Brands,* 501 F.3d at 1313. In addition, because there is no plausible allegation that the Nalu device has ever been operated in a directly infringing manner, Nevro's induced infringement claims must also be dismissed. *See Boston Scientific*, 415 F. Supp. 3d at 491 ("A plaintiff can prevail on claims of induced … infringement only if it establishes direct infringement.").

## B. Nevro's Allegations are Insufficient to Meet the Knowledge Requirements of Induced or Willful Infringement

"Claims for induced and willful patent infringement each require that the infringer had knowledge of the patent and knowledge of its infringement." *Dynamic Data Techs. v. Google LLC*, No. CV 19-1529-CFC, 2020 WL 1285852, at *2 (D. Del. Mar. 18, 2020), *report and recommendation adopted sub nom*. *Dynamic Data Techs., LLC v. Google LLC*, No. CV 19-1529-CFC, 2020 WL 3103786 (D. Del. June 11, 2020). To plead induced infringement, a plaintiff "must

plead facts plausibly showing that the accused infringer specifically intended another party to infringe the patent and knew that the other party's acts constituted infringement." *Boston Scientific*, 415 F. Supp. 3d at 491 (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017)). Likewise, to plead willful infringement, a plaintiff must "allege[] facts from which it can be plausibly inferred that the party accused of infringement had knowledge of the asserted patent and knowledge that the party's alleged conduct constituted, induced, or contributed to infringement of the asserted patent." *Id.* at 495. Nevro is therefore required to allege facts showing that Nalu not only had knowledge of the Asserted Patents, but also knowledge of *infringement* of the Asserted Patents.

Here, Nevro has alleged that: 1) Nalu was aware of Nevro's patent marking; 2) Nalu was aware of Nevro's lawsuits against other companies, alleging infringement of the Asserted Patents by other products; and 3) Nalu disclosed several of the Asserted Patents as prior art in one of its own patent applications. D.I. 14 ¶47. These allegations at most show that Nalu was aware of Nevro's *patents*, but provide no plausible allegations why Nalu would have known that it was infringing any of the Asserted Patents. *See Dynamic Data*, 2020 WL 1285852, at *2 (dismissing inducement and willful infringement claims where the complaint did "not articulate why, in the absence of having received a pre-suit notice letter explaining why the accused products infringed … [the defendant] would have

nevertheless understood (prior to being served with the Complaint) that such infringement had been occurring").

## IV.   CONCLUSION

Nevro's allegations of patent infringement are not supported by plausible facts.  Nevro offers no plausible allegation that the Nalu system has ever been programmed to deliver a therapy signal that falls within the scope of Nevro's claims and, as a result, there is no sufficient allegation of direct infringement. Furthermore, Nevro fails to make any plausible allegations that Nalu knew it was infringing any of the Asserted Patents prior to this lawsuit and therefore, Nevro's assertions of induced infringement and willful infringement also fail.  Nalu therefore respectfully requests that the First Amended Complaint be dismissed.  In view of the fact that the Nevro has been on notice of these deficiencies in its pleading and was not able to cure them in its amended complaint, Nalu further requests that the dismissal be with prejudice.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:   */s/ Philip A. Rovner*

A. James Isbester    Philip A. Rovner (#3215)
Megan M. Chung     Jonathan A. Choa (#5319)
KILPATRICK TOWNSEND &  P.O. Box 951
STOCKTON LLP     Wilmington, DE 19899
12255 El Camino Real, Suite 250 (302) 984-6000
San Diego, CA  92130   provner@potteranderson.com
         jchoa@potteranderson.com
Maureen P. Long
KILPATRICK TOWNSEND &  *Attorneys for Defendant*
STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400

Dated:  July 6, 2020
6787448

- 18 -